IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TIMOTHY J. BUSS, | ) | CASE NO.  5:22-CV-01691-PAG |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | UNITED STATES DISTRICT JUDGE |
| vs. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JONATHAN D. GREENBERG |
| SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Timothy Buss ("Plaintiff" or "Buss"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying his applications for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and REMANDED for further proceedings consistent with this opinion.

## I.    PROCEDURAL HISTORY

In September 2019, Buss filed an application for POD and DIB, alleging a disability onset date of January 14, 2019 and claiming he was disabled due to degenerative disc disease.  (Transcript ("Tr.") 14, 68, 78.)  The application was denied initially and upon reconsideration, and Buss requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 14.)

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

1

On July 28, 2021, an ALJ held a hearing, during which Buss, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On August 27, 2021, the ALJ issued a written decision finding Buss was not disabled.  (*Id.* at 14-24.)  The ALJ's decision became final on August 1, 2022, when the Appeals Council declined further review.  (*Id.* at 1-7.)

On September 21, 2022, Buss filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 6-8.)  Buss raises the following issue on judicial review:

> (1) Whether the administrative law judge erred in his evaluation of pain and other symptoms where he measured Mr. Buss's symptoms on an erroneous standard, he ignored Mr. Buss's ability to sustain activity, he failed to consider the record as a whole, including Mr. Buss's hearing testimony, and thus failed to build a logical bridge between the evidence and the ultimate conclusions concerning residual functional capacity.

(Doc. No. 6.)

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Buss was born in November 1968 and was 52 years-old at the time of his administrative hearing (Tr. 14, 23), making him a "person closely approaching advanced age" under Social Security regulations. *See* 20 C.F.R. § 404.1563(d).  He has at least a high school education.  (Tr. 23.)  He has past relevant work as a forklift operator, windshield installer, and building maintenance worker.  (*Id*. at 22.)

### B.  Medical Evidence[2]

On May 9, 2018, Buss' primary care physician Dr. Charles Milligan completed FMLA paperwork on Buss' behalf.  (*Id.* at 348-51.)  Dr. Milligan reported that Buss had intermittent flare-ups that required

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  Further, as Buss limits his challenges to the ALJ's findings regarding his spinal impairment, the Court also limits its discussion of the relevant evidence to his spinal impairment.

time off for a few days.  (*Id.* at 349.)  Dr. Milligan noted Buss had developed a treatment protocol to manage at home most of the time.  (*Id.*)  He occasionally required manipulative treatment.  (*Id.*)  The flare-ups occurred "rarely" and would require him to be absent from work once a month.  (*Id.* at 350.)

On October 17, 2018, Buss saw Dr. Milligan regarding his low back pain.  (*Id.* at 295.)  Buss reported the pain started two weeks ago and was mainly on the left side.  (*Id.*)  Buss told Dr. Milligan he had not been able to work at all that week, he had not been able to sleep much, and his legs felt weak. (*Id.*)  Buss denied any numbness or tingling.  (*Id.*)  Buss reported he was unable to get up without using his hands, he was unable to stand straight, and it hurt to walk.  (*Id.*)  Buss also told Dr. Milligan he had muscle spasm and reduced range of motion.  (*Id.*)  Buss described his pain as sharp, aching, and severe. (*Id.*)  Standing, sitting, and walking aggravated his pain.  (*Id.*)  Buss reported using his TENS unit with no relief.  (*Id.*)  Dr. Milligan noted Buss was unable to do his ADLs or work without limitations.  (*Id.*)  On examination, Dr. Milligan found tenderness over the thoracic, lumbar, and sacral vertebra and over the sacroiliac region.  (*Id.* at 296.)  Dr. Milligan performed osteopathic manipulative treatment.  (*Id.*)  Dr. Milligan noted Buss could stand without using his hands, could lean back with less discomfort, and had less pain after treatment.  (*Id.* at 297.)  Dr. Milligan encouraged Buss to use his TENS unit and walk that day, increase his fluid intake, and do back stretches.  (*Id.*)

Dr. Milligan provided Buss with a note excusing him from work from October 15-21, 2018.  (*Id.* at 347.)  Dr. Milligan stated Buss could return to work on October 22, 2018.  (*Id.*)

On October 30, 2018, Buss saw Dr. Milligan for follow up regarding his continued low back pain. (*Id.* at 293.)  Buss reported his pain was severe and he was only sleeping for maybe an hour before he back up again.  (*Id.*)  Buss told Dr. Milligan the treatment he received at his last appointment lasted for a day and then the pain came back and radiated down his leg.  (*Id.*)  Buss had called the surgeon's office but was told he could get in faster with a referral.  (*Id.*)  Buss reported taking Tylenol and using the TENS unit

with no relief.  (*Id.*)  On examination, Dr. Milligan found no significant changes from last visit.  (*Id.* at 294.)  Dr. Milligan noted Buss' motion was okay, but it was limited by pain.  (*Id.*)  Dr. Milligan referred Buss to his orthopedic surgeon Scot Miller, D.O., prescribed 10 days of Oxycodone, and ordered a lumbar MRI.  (*Id.*)

An MRI taken on October 31, 2018 showed mild multilevel degenerative changes with a superimposed lower lumbar fusion and laminectomy, interval removal of bilateral pedicle screws at L4-5, and an incompletely visualized small meningocele in the laminectomy bed.  (*Id.* at 339-40.)

On November 6, 2018, Buss saw surgeon Dr. Miller for evaluation of his lower back pain.  (*Id.* at 218.)  Buss reported his symptoms began about seven weeks before at work.  (*Id.*)  Buss told Dr. Miller he had seen his primary care physician a week later, and his back pain had been getting worse since then.  (*Id.*)  Buss reported pain that radiated down his legs, sharp intermittent pain, some tingling in his feet, and difficulty sleeping at night because of the pain.  (*Id.*)  Buss told Dr. Miller he had undergone lumbar spine surgery in 2006 and hardware removal in 2015.  (*Id.*)  Activities worsened Buss' pain, while resting improved it.  (*Id.*)  Buss described his back pain as continuous and rated his pain that day as a 6/10.  (*Id.*)  Buss reported taking prednisone for 1-2 weeks with no relief and oxycodone for 1-2 weeks with improvement.  (*Id.*)  On examination, Dr. Miller found ambulation with difficulty, well-healed incision, balanced and upright posture, limited and stiff lumbar range of motion, full strength, intact sensation, and normal reflexes.  (*Id.* at 220-21.)  Dr. Miller recommended a cortisone injection and continued pain management.  (*Id.* at 221.)  Dr. Miller noted Buss would not return to work until after his cortisol injection.  (*Id.*)  Dr. Miller gave Buss a work slip stating that he was unable to work and had a return-to-work date of January 7, 2019.  (*Id.*)

An x-ray taken that same day showed significant degenerative changes at L2-3 and L3-4 with anterior osteophytes present at L2-3; lumbar scoliosis just above the previous fusion at L3-4; and mild to moderate bilateral hip arthritis. (*Id.* at 228.) There was no evidence of lumbar instability. (*Id.*)

On November 14, 2018, Buss saw Dr. Milligan for follow up. (*Id.* at 290.) Buss reported he had seen Dr. Miller, who wanted him to have injections first, although he would probably still need surgery. (*Id.*) Dr. Miller's office wanted Buss to get his medication from Dr. Milligan. (*Id.*) Dr. Miller restarted Buss on oxycodone. (*Id.*)

On December 18, 2018, Buss saw Dr. Milligan for follow up. (*Id.* at 286.) Dr. Milligan noted Buss had chronic low back pain that was "severe and disabling" and had been worked up before. (*Id.*) Buss reported good energy levels and sleeping well. (*Id.*) On examination, Dr. Milligan found normal posture, normal muscle strength, abnormal gait, full range of motion in all joints, and normal joints and muscles. (*Id.* at 287.)

On January 23, 2019, Buss saw neurologist James Bavis, M.D., for an initial consultation regarding weakness and back pain. (*Id.* at 329.) Buss reported weakness in his legs and that he tripped and stumbled when going up or down stairs. (*Id.*) Buss told Dr. Bavis his back pain was aggravated by bending and standing and relieved by pain medications. (*Id.*) On examination, Dr. Bavis found reduced (2/5 to 5/5) muscle strength, decreased sensation in the right leg, and arthralgic gait. (*Id.* at 330-31.) Dr. Bavis noted Buss had signs of L5 radiculopathy in his right leg and L4 radiculopathy in his left leg, which was worse. (*Id.* at 331.) Dr. Bavis ordered an EMG/NCS of that side. (*Id.*)

On February 6, 2019, Buss saw orthopedic surgeon Jared Stefanko, D.O., for a consultation regarding his back pain. (*Id.* at 432, 435.) Buss complained of lumbar spine pain that he rated as a 10/10 most days. (*Id.* at 432.) Buss reported his pain increased when he stood in one spot, especially for a prolonged period of time, and he had difficulty walking, standing, and sitting as a result of back and leg

pain.  (*Id.*)  Buss told Dr. Stefanko he could not walk without pain in his lumbar spine, buttock, and left leg.  (*Id.*)  Buss reported the pain had gotten worse with time, and he was not able to complete his activities of daily living because of his pain.  (*Id.*)  Buss endorsed tingling and weakness.  (*Id.*)  On examination, Dr. Stefanko found normal gait and station, mild pain on the left with extension, full muscle strength, normal sensation, and negative straight leg raise tests.  (*Id.* at 433.)  Dr. Stefanko noted that x-rays showed some collapse at the level above his previous fusion at L3-4.  (*Id.* at 434.)  Dr. Stefanko recommended that Buss have a lumbar facet injection at L3-4 to make sure it was the issue and for insurance purposes.  (*Id.* at 435.)  Dr. Stefanko told Buss he may need another fusion at the level above L3-4.  (*Id.*)

On February 19, 2019, Buss saw Dr. Milligan for follow up of his back pain and for Dr. Milligan to perform another osteopathic manipulative treatment.  (*Id.* at 281.)  Buss reported he was scheduled for a facet injection but needed to do a consult first since it had been more than a year since he had seen that doctor.  (*Id.*)  Buss told Dr. Milligan that Dr. Stefanko was 90% sure he would need another fusion.  (*Id.*)  Dr. Milligan performed another osteopathic manipulative treatment and restarted oxycodone.  (*Id.*)

On February 20, 2019, Buss saw A. Harris Basali, M.D., for follow up of his lower back pain, left worse than right.  (*Id.* at 446.)  Dr. Basali noted he had last seen Buss in June 2017.  (*Id.*)  Buss reported more pain with his back and weakness in both of his legs.  (*Id.*)  Home exercises caused Buss a lot of pain.  (*Id.*)  Buss rated his pain as a 6/10.  (*Id.*)  Buss told Dr. Basali his pain was a 7/10 on average, a 10/10 at worst, and a 2/10 at best.  (*Id.*)  Buss reported his pain reduced his ability to drive, do housework, work, walk at least one block, climb the stairs, and do his normal exercise/sports.  (*Id.*)  Buss further reported problems falling asleep, staying asleep, and going back to sleep because of his pain.  (*Id.*)  Buss told Dr. Basali his pain was worse in the morning and aggravated by lifting heavy weight, climbing stairs, walking,

bending forward and backward, prolonged sitting, and prolonged standing.  (*Id.*)  Associated symptoms included tingling sensations, numbness, and weakness in the lower back and legs.  (*Id.*)

On examination, Dr. Basali noted Buss was in mild distress because of his pain.  (*Id.* at 447.)  Dr. Basali found normal posture, normal gait, limited flexion, extension, side bend, and rotation, severe tenderness at left L3-5 and S1, severe spasticity throughout the lumbar spine, paravertebral tenderness, facet tenderness left greater than right, normal sensation, normal reflexes, and normal motor exam.  (*Id.* at 447-48.)  Buss' diagnoses included lumbar spondylosis, lumbar and lumbosacral intervertebral disc degeneration, and post-laminectomy syndrome.  (*Id.* at 448.)

On February 6, 2019, Dr. Basali administed lumbar facet injections on the left at L3-4, L4-5, and L5-S1.  (*Id.* at 440-43.)

On March 7, 2019, Buss saw Dr. Basali for follow up after his injections.  (*Id.* at 436.)  Buss reported relief for one day before his pain returned.  (*Id.*)  Buss told Dr. Basali there was no way for him to get comfortable, the pain was constant, and he could not sleep at night.  (*Id.*)  Buss reported the surgeon was going to do surgery soon.  (*Id.*)  Buss told Dr. Basali that heat and ice provided some relief, and he used his TENS unit often.  (*Id.*)  Dr. Basali noted Buss' pain was moderately reduced.  (*Id.*)  Buss rated his pain as a 6/10 that day, with the pain at a 9/10 at its worst and a 6/10 at its best.  (*Id.*)  On examination, Dr. Basali found discomfort of lumber spine and the lower extremities bilaterally, uneven gait, normal sensation, normal reflexes, and normal motor exam.  (*Id.* at 437.)  Dr. Basali started Buss on Xtampza. (*Id.* at 438.)

On March 8, 2019, Buss saw Dr. Stefanko for follow up after his lumbar spine injections.  (*Id.* at 373, 376.)  Buss reported the injections provided 30% pain relief for a few days and then decreased from there.  (*Id.* at 373.)  Buss told Dr. Stefanko he was having constant daily back pain on his left side that radiated down his left leg, with intermittent numbness and tingling.  (*Id.*)  Buss reported an average pain

7

level of 6-7/10, and he was taking Oxycodone four times a day.  (*Id.*)  Dr. Stefanko did not conduct a formal examination but noted normal gait and station and tenderness off the midline of the lumbar spine on the left.  (*Id.* at 374.)  Dr. Stefanko recommended surgical intervention.  (*Id.* at 375.)  Dr. Stefanko ordered a CT scan prior to surgery.  (*Id.*)

A CT scan of the lumbar spine taken on April 17, 2019 revealed no acute osseous abnormality of the lumbar spine, mild degenerative disease of the lumbar spine without significant spinal canal stenosis, mild L2-L3 spinal canal stenosis, moderate to severe bilateral L3-L4 neural foraminal stenosis, post-surgical changes of the lower lumbar spine, and a small fluid collection within the surgical bed immediately posterior to the thecal sac that could represent a post-operative seroma or hematoma, although an abscess could not be excluded based on the imaging appearance alone.  (*Id.* at 425-27.)

On April 19, 2019, Buss saw Marcia Grossman, PA-C, for a pre-operative visit.  (*Id.* at 378, 381.)  Buss reported continued moderate back pain that he rated as a 4-5/10, with pain and tingling in his left buttock and left leg to his knee.  (*Id.* at 378.)  Buss told Grossman both legs felt weak, and he had trouble with stairs.  (*Id.*)  On examination, Grossman found moderate antalgic gait, mild limp while walking, moderate tenderness of the left paraspinous muscles, normal lower extremities, and positive straight leg raise test bilaterally.  (*Id.* at 379.)

On April 30, 2019, Buss underwent lumbar surgery, including an extreme lateral interbody fusion at L3-4 with a titanium truss cage and pedicle screw fixation.  (*Id.* at 420-24.)

On May 17, 2019, Busss saw PA Grossman for his first post-operative appointment.  (*Id.* at 383, 385.)  Buss reported back pain that he rated as a 3-4/10 during the day and that was worse at night, with continued stiffness and cramping in his left hip and thigh area.  (*Id.* at 383.)  His left leg continued to feel a bit weak, but his pain and numbness were much better.  (*Id.*)  Buss told Grossman he was taking his pain medication mainly at night, and he only occasionally used Flexeril as it made him sleepy.  (*Id.*)  On

examination, Grossman found Buss moved all extremities well, with full strength and no edema or erythema.  (*Id.* at 384.)

At his second post-operative appointment in June 2019, Buss reported a lot of left hip pain that he rated as a 4/10 and back muscle stiffness.  (*Id.* at 392.)  PA Grossman found similar findings on examination.  (*Id.* at 393.)  Grossman noted Buss was "doing well from surgery," although he "still has some left thigh/hip pain and achiness in the back area."  (*Id.* at 394.)  Grossman refilled Buss' Norco prescription and ordered physical therapy.  (*Id.*)

At his third post-operative visit in July 2019, Buss reported his back was doing much better but that he tried mowing the other day and his muscles were bothering him.  (*Id.* at 397.)  Buss denied numbness and tingling.  (*Id.*)  Buss reported intermittent back pain that he rated as a 3/10 and that was aggravated by bending, lifting, and extended walking and that was worse at night.  (*Id.*)  On examination, Dr. Stefanko found normal gait, full strength, and no edema and erythema in the lower extremities.  (*Id.* at 398.)  Dr. Stefanko noted Buss moved all extremities well.  (*Id.*)  Dr. Stefanko recommended physical therapy as his pain may be muscular.  (*Id.* at 399.)  Dr. Stefanko noted:

> All his right pain is gone and his L3 radiculopathy.  He is still complaining of right sided back pain in which I told him he has never done therapy due to insurance issues.  I told him it could just be related to not doing therapy.  Still looking to get his insurance addresses.  I told him that if he gets this figured out, we can get him a script for therapy.  He wants to be referred back to pain management for the back pain.  I told him I dont [sic] have any problem with that. I am not going to be giving out more narcotics at this time.  We will kind of regroup and go from there.  I will see him back in my office in 3-4 months, with xrays on arrival.

(*Id.*)

At his fourth post-operative visit in September 2019, Buss reported leg weakness and an inability to do physical therapy because of cost.  (*Id.* at 405.)  Buss endorsed continued back pain, although it was not as bad as it was, and muscle cramping at night.  (*Id.*)  Buss reported bending made his pain worse, and he was taking ibuprofen morning and night for pain.  (*Id.*)  Buss denied numbness or tingling.  (*Id.*)  Dr.

Stefanko noted he had received a call from Lincoln financial disability asking if Buss could get an FCE and that it was needed for Buss to keep his disability.  (*Id.* at 406.)  Buss told Dr. Stefanko he was fine doing the FCE and so Dr. Stefanko stated he would order it.  (*Id.*)  Dr. Stefanko noted Buss reported he was about to get a job.  (*Id.*)

At his fifth post-operative appointment in November 2019, Buss reported some aching, difficulty putting on his socks and shoes, "'wobbly'" balance, and that his right leg would "'go to sleep.'"  (*Id.* at 409.)  Buss told Dr. Stefanko he was taking Tylenol for his pain, doing home stretches, and not working. (*Id.*)  Buss reported he felt that he was improving.  (*Id.*)  On examination, Dr. Stefanko found mild limp when walking, normal station, full range of motion, no tenderness, full muscle strength, intact sensation, and negative straight leg raises.  (*Id.* at 410.)  Dr. Stefanko noted Buss was doing well and that Buss reported feeling better than he did before surgery.  (*Id.* at 411.)  Buss needed an FCE for his disability, and Dr. Stefanko stated he would give Buss an order for this.  (*Id.*)

On May 4, 2020, Buss completed an Adult Function Report.  (*Id.* at 181-88.)  Buss reported he was limited in his lifting and if he was on his feet for too long, his back started to hurt.  (*Id.* at 181.)  He tried to do things around the house but most of what he did was done while he was sitting.  (*Id.* at 182.)  He tried to go for a walk every day but anything prolonged hurt his back.  (*Id.*)  Buss had a hard time putting his socks, shoes, and pants on, and he needed to take showers and use a long brush to wash.  (*Id.*)  His mother cooked supper every night, but he got his own breakfast and lunch.  (*Id.* at 183.)  He could sweep, do his laundry, and mow the yard with a self-propelled mower, but he could only do a little at a time.  (*Id.*)  He could only mow for 15-20 minutes at a time.  (*Id.*)  He could do household repairs if the repair was not too big.  (*Id.*)  He could drive a car and he could shop in stores.  (*Id.* at 184.)  Shopping took longer because he had to walk much slower.  (*Id.*)  He enjoyed woodworking and working with tools, but everything took him longer, he could not lift anything over 15 pounds, and he could not do anything over

his head.  (*Id.* at 185.)  He spent time with others a few times a week, including visiting his sons and grandchildren.  (*Id.*)  He took part as much as he could.  (*Id.*)  He could lift 20 pounds, but his back started to hurt with squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, and using his hands after a period of time.  (*Id.* at 186.)  He could walk for a quarter of a mile before he needed to stop and rest for five to ten minutes.  (*Id.*)  He used a brace as needed that was prescribed by his doctor in 2018.  (*Id.* at 187.)

On May 27, 2020, Buss saw Dr. Stefanko for follow up.  (*Id.* at 471.)  Buss reported improvement in his low back, and while he still had issues putting on his socks and shoes, it was "much better" than it was before surgery.  (*Id.*)  Buss reported intermittent right foot numbness and tingling and intermittent back pain that he rated as a 2/10.  (*Id.*)  Standing or walking for long periods of time and driving made his pain worse.  (*Id.*)  Buss took Tylenol for his pain.  (*Id.*)   On examination, Dr. Stefanko found mild limp when walking, normal station, full range of motion, no tenderness, full muscle strength, intact sensation, and negative straight leg raises.  (*Id.* at 472.)  X-rays showed good fusion and good positioning of the hardware.  (*Id.* at 473.)  Dr. Stefanko noted he would see Buss in two years.  (*Id.* at 474.)

On August 5, 2020, Dr. Stefanko completed a form for Lincoln Financial Group stating that Buss had been totally disabled from April 30, 2020 to May 31, 2020, Buss was capable of returning to work on June 1, 2020, and Buss was capable of heavy work with no restrictions.  (*Id.* at 576.)

On August 31, 2020, Buss saw Peter Su, M.D., for a consultative physical evaluation.  (*Id.* at 500-02.)  Buss reported continued back pain even after his 2019 surgery that he rated as a 3-4/10 with rest.  (*Id.* at 500.)  The pain radiated down to his buttocks bilaterally, although Buss denied any weakness in his extremities.  (*Id.*)  Buss told Dr. Su he could walk for about fifteen minutes.  (*Id.*)  Buss denied using any assistive device when walking.  (*Id.*)  Buss reported when he bent over slightly with assistance, his back pain improved.  (*Id.*)  Buss denied taking any medications.  (*Id.* at 501.)  On examination Dr. Su found

11

Buss in no acute distress with mild tenderness along the lower spine, mild paraspinal muscle tenderness, negative straight leg raise, no swelling or erythema of the lower extremities, 4/5 muscle strength, and intact balance. (*Id.*) Dr. Su noted Buss was able to walk out of the exam room without difficulty. (*Id.*) Dr. Su opined:

> The claimant is a 51-year-old male with complaints of having continuous back pain even with two back surgeries. The claimant is unable to lift heavy objects, unable to bend over for long periods of time and unable to walk more than 15 minutes without having a break. The claimant does find that if he lies down for a short period of time his back does improve. The claimant does not use a walker or a cane to assist in his walking but stated that if he is walking with a shopping cart it makes his back pain a little bit better.
>
> At this point I believe that the claimant is able to perform less than sedentary level of work. The claimant may benefit from physical therapy to increase his mobility. The claimant should refrain from lifting objects greater than 20 pounds due to his history of back surgeries as well.

(*Id.* at 502.)

In September 2020, Buss completed a functional activities questionnaire for his doctor. (*Id.* at 553.) Buss reported he could do yard work if he paced himself and did it over the course of a day, he could sit through a movie, play, or concert, and he could walk around in his yard. (*Id.*) He could not walk around the block. (*Id.*) He could shop for groceries, carry the groceries into the house, and put them away. (*Id.*) He could do laundry, cook, and do housework. (*Id.*) He could walk up and down stairs. (*Id.*) He could care for himself. (*Id.*) He could drive or sit in a car for one and a half to two hours before needing to get out and stretch, and he could walk for 10-15 minutes before needing to sit down. (*Id.*) Buss reported he usually sat for four to six hours a day, stood or walked for two to three hours a day, and lied down/reclined for four to six hours a day. (*Id.*) Buss' most comfortable position was lying on his back. (*Id.*)

On October 5, 2020, Buss underwent a functional capacity evaluation with Michelle Kunkle, OTR/L, CHT. (*Id.* at 555-59.) Buss reported back pain that he rated as a 1-2/10 when sitting and for

12

which he took Tylenol.  (*Id.* at 557.)  Buss told Kunkle he was on disability through work.  (*Id.*)  Buss reported he was independent with bathing/dressing, used a walk-in shower, and drove independently.  (*Id.*)  Buss' sister did the grocery shopping, and his mother did the cooking.  (*Id.*)  Buss helped with laundry but had to be careful with how he did the tasks.  (*Id.*)  All three of them shared in the cleaning.  (*Id.*)  Buss mowed the lawn with a riding mower, and he and his sister shared the yard work.  (*Id.*)  On examination, Buss walked for seven minutes with an antalgic gait, stood for three minutes shifting his weight and leaning on the countertop, and sat for 30 minutes while shifting his body weight.  (*Id.* at 557-58.)  Kunkle opined Buss could stand and walk on an occasional basis (1-33% of the workday) and sit on a frequent basis (34-66% of the workday).  (*Id.* at 556, 558.)  Kunkle noted Buss was "limited with functional tasks due to back pain."  (*Id.* at 558.)  Buss had a heart rate of 122 and an increase in pain during the assessment from a 1-2/10 to a 7/10 with repetitive squatting, bending, and kneeling.  (*Id.* at 558-59.)

## C.    State Agency Reports

On October 17, 2020, state agency reviewer Steve McKee, M.D., reviewed the file and opined that Buss could lift/carry 20 pounds occasionally and 10 pounds frequently.  (*Id.* at 73-74.)  His ability to push and/or pull with the lower extremities was unlimited, other than shown for lift and/or carry.  (*Id.* at 73.)  He could stand/walk about six hours in an eight-hour workday and sit about six hours in an eight-hour workday.  (*Id.*)  Buss could occasionally climb ramps/stairs, but could never climb ladders, ropes, or scaffolds.  (*Id.* at 74.)  He could occasionally balance, stoop, kneel, crouch, and crawl.  (*Id.*)  He could occasionally push/pull/operate hand controls and reach in all directions with his left upper extremity.  (*Id.*)

On March 11, 2021, on reconsideration, Elizabeth Das, M.D., affirmed most of Dr. McKee's findings, except Dr. Das opined Buss had an unlimited ability to balance, kneel, and reach in front and/or laterally.  (*Id.* at 81-82.)

13

### D.      Hearing Testimony

During the July 28, 2021 hearing, Buss testified to the following:

- He has a driver's license.  (*Id.* at 41.)

- He still has back pain.  (*Id.* at 52.)  Dr. Stefanko wanted to do L2 and L3 at the same time, but insurance would not allow it, so he will need to have the surgery at some point.  (*Id.*)  He can tell his back is getting worse by the pain and how it limits him from doing things.  (*Id.*)  He cannot do any kind of work.  (*Id.*)  If he sits for more than half an hour or so, his back starts hurting, and he will have to get up and walk around.  (*Id.* at 52-53.)  If he walks around for too long, his back starts hurting, and he needs to sit or lie down.  (*Id.* at 53.)  He can walk for about half a mile.  (*Id.*)  It is easier for him to walk around than it is for him to stand in one place.  (*Id.*)  He can stand for 15-20 minutes before he needs to sit down.  (*Id.*)  He does not use an assistive device.  (*Id.*)  He could lift 20 pounds.  (*Id.*)  He could lift 20 pounds six times over the course of an eight-hour workday.  (*Id.* at 57.)

- He was doing therapy, but COVID put a stop to that.  (*Id.* at 54.)  He was thinking about going back to pain management, but there is no one in his general area that he likes, so he has to find someone out of town.  (*Id.*)  He takes Tylenol for his pain. (*Id.*)  Injections sometimes helped for three to four months, but other times they would not help at all.  (*Id.*)  He lies down, uses a heating pad, and elevates his feet to help his pain.  (*Id.* at 58.)  He is doing these things on a daily basis.  (*Id.*)  He got addicted to pain medication after his first surgery and did not want to go back down that road. (*Id.*)  He would take pain medication before a surgery or when his pain was getting unbearable, but he would not take pain medication on a daily basis.  (*Id.*)  He uses a heating pad three to four times a week.  (*Id.* at 58-59.)  He uses a TENS unit every day, which helps his pain.  (*Id.* at 59.)

- His pain affects his sleep.  (*Id.* at 54.)  He gets five hours of good sleep a night.  (*Id.*) He has a hard time putting on his socks.  (*Id.* at 55.)

- He can help with things around the house, like laundry, cooking, and cleaning.  (*Id.*) He can go to the grocery store.  (*Id.*)  He visits with friends at their homes but does not go to clubs or anything like that.  (*Id.*)  He cannot say what he likes to do with his time since there is not much he can do.  (*Id.*)  He used to enjoy golf and gardening, but he cannot garden anymore because of the pain he has when standing up after bending over.  (*Id.* at 55-56.)  He cannot play softball and other sports like he used to do.  (*Id.* at 56.)  His sister does most of the mowing now, as mowing aggravated his back.  (*Id.*)

The VE testified Buss had past work as a building maintenance worker, forklift operator, and a composite job between a forklift operator and windshield installer.  (*Id.* at 61.)  The ALJ then posed the following hypothetical question:

14

Okay.  For my first hypothetical I want you to consider an individual of the same age, educational background, and work experience as the claimant.  I want you to presume the individual can perform the [INAUDIBLE] of light work subject to the following limitations.   Specifically, the individual would be limited to occasional reaching – I'm sorry – well, okay.  Occasional reaching overhead with the left upper extremity and frequent reaching in all other directions with the left upper extremity.   This individual would be limited to frequent handling or fingering bilaterally.  The individual would be limited to occasional climbing of ramps or stairs, but would never climb ladders, ropes, or scaffolds.   The individual would be limited to occasional stooping, kneeling, crouching, or crawling.   The individual would never be exposed to unprotected heights, hazardous machinery, or commercial driving.  Could such an individual perform the past work of the claimant?

(*Id.* at 61-62.)

The VE testified the hypothetical individual would not be able to perform Buss' past work as a building maintenance worker, forklift operator, and a composite job between a forklift operator and windshield installer.  (*Id.* at 62.)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as cashier, retail marker, and assembler.  (*Id.*)

The ALJ modified the hypothetical to limit the hypothetical individual to a full range of sedentary work with the same limitations.  (*Id.* at 63.)  The VE testified there would be no past work.  (*Id.*)  Because of Buss' age, the ALJ did not need for the VE to provide additional jobs.  (*Id.*)

The ALJ modified the hypothetical to reflect that the hypothetical individual would need to elevate their legs to waist level for one hour out of every workday.  (*Id.*)  The VE testified there would be no jobs for such an individual.  (*Id.*)

Buss' counsel asked the VE whether an individual who could only stand and/or walk for two hours out of an eight-hour workday would be limited to sedentary exertion.  (*Id.* at 65.)  The VE testified that such an individual would be limited to sedentary work.  (*Id.*)

### III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically

15

determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, and 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. § 404.1520(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. § 404.1520(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience.  *See* 20 C.F.R. § 404.1520(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. § 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c).

16

Here, Buss was insured on his alleged disability onset date, January 14, 2019, and remains insured through December 31, 2023, his date last insured ("DLI").  (Tr. 14.)  Therefore, in order to be entitled to POD and DIB, Buss must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act (the "Act") through December 31, 2023.

2.   The claimant has not engaged in substantial gainful activity since January 14, 2019, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.   The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, status-post two fusion surgeries, left shoulder rotator cuff tear, status-post surgical repair, right carpal tunnel syndrome and trigger finger, status-post surgery (20 CFR 404.1520(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that the claimant may occasionally reach overhead, and frequently reach in all other directions, with the left upper extremity; the claimant may frequently handle and finger with the bilateral upper extremities; the claimant may occasionally stoop, kneel, crouch, crawl, climb ramps and stairs, but may never climb ladders, ropes or scaffolds; the claimant must avoid all exposure to heights, hazardous machinery, and commercial driving.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.   The claimant was born on November **, 1968 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8.   The claimant has at least a high school education (20 CFR 404.1564).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding

that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from January 14, 2019, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 16-24.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)

("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

As part of his single issue on judicial review, Buss argues the ALJ failed to consider the record as a whole, including Buss' hearing testimony and a self-report Buss completed for his doctor.  (Doc. No. 6 at 18-20.)

The Commissioner responds that substantial evidence supports the ALJ's subjective symptom analysis, and that the ALJ acknowledged Buss' "testimony regarding his alleged difficulties" by noting that Buss could only mow the lawn in increments and used "some self-taught accommodations."  (Doc. No. 7 at 6, 10.)  While there were conflicts in the record regarding Buss' daily activities, that was not problematic and did not require remand as the ALJ was within his zone of choice.  (*Id.* at 10.)  The Commissioner argues this Court should decline Buss' request to try this case *de novo*.  (*Id.*)

In reply, Buss argues that while the ALJ acknowledged he performed some daily activities with "'self-taught accommodations,'" the ALJ "never address[d] these accommodations and the impact of the accommodations on the ability to perform more than sedentary work exertionally on a sustained basis." (Doc. No. 8 at 4.)

When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  *See e.g., Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 921 (6th Cir. 2011).  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms.  Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work."  20 C.F.R. § 404.1529(c)(1).  *See also* SSR 16-3p,[3] 2016 WL 1119029 (March 16, 2016).

---

[3] SSR 16-3p superseded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016.  Thus, SSR 16-3 was in effect at the time of the July 28, 2021 hearing.

If these claims are not substantiated by the medical record, the ALJ must make a credibility[4] determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* 20 C.F.R. § 404.1529; SSR 16-3p, 2016 WL 1119029 (March 16, 2016). Beyond medical evidence, there are seven factors that the ALJ should consider.[5] The ALJ need not analyze all seven factors but should show that he considered the relevant

---

[4] SSR 16-3p has removed the term "credibility" from the analysis. Rather, SSR 16-3p directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with objective medical evidence and other evidence." SSR 16-3p, 2016 WL 1119029, at *6. The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016).

[5] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and

evidence.  *See Cross*, 373 F. Supp. 2d at 733; *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005).

As part of the RFC analysis and the subjective symptom evaluation, the ALJ found as follows:

> At one point or another in the record (either in forms completed in connection with the application and appeal, in medical reports or records, or in the claimant's testimony), the claimant has reported the following daily activities: the claimant reports to be able to perform all his activities of daily living (8F/2), including self-care [with some self-taught accommodations], and pet care. The claimant is able to sweep, launder clothing, prepare simple, meals, to sweep, cut grass in one-hour increments, perform household repairs, to drive a car, shop in stores, manage his own appointments, finances and an e-mail account. The claimant visits his sons and grandchildren, and woodworks for pleasure (5E). In short, the claimant has described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. While none of these activities, considered in isolation, would warrant or direct a finding of "not disabled"; when considered in combination, they strongly suggest that the claimant would be capable of engaging in the work activity contemplated by the residual functional capacity.
>
> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(*Id.* at 20.)

Other than perhaps a passing (and uncited) reference to Buss's testimony in the above discussion of his daily activities, the ALJ failed to acknowledge or discuss Buss' hearing testimony regarding his symptoms and limitations.  (*Id.* at 18-22.)  As of the hearing date, Buss' sister did most of the mowing because it aggravated his back pain.  (*Id.* at 56.)   Furthermore, the ALJ mischaracterizes Buss' self-reports, as Buss reported mowing in 15–20-minute increments, not one-hour increments.  (*Id.* at 183.) Indeed, Buss reported only doing a little bit at a time in terms of household chores.  (*Id.*)  Nowhere in the

---

restrictions due to pain or other symptoms.  *See* SSR 16-3p, 2016 WL 1119029, at *7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

decision does the ALJ mention the September 2020 self-report Buss completed, where he reported he sat for four to six hours a day, reclined for four to six hours a day, and stood or walked for two to three hours a day, and that he could walk for 10-15 minutes before needing to sit down.  (*Id.* at 553.)

In addition, the ALJ failed to mention findings supportive of disability in his discussion of the medical evidence.  For example, the ALJ appears to fault Buss for failing to attend physical therapy, despite numerous references in the record to Buss' inability to afford it.  (*Id.* at 399, 405.)  The ALJ appears to fault Buss for not "discernibly follow[ing] any chronic course of prescription therapy for any impairment" (*id.* at 19), despite Buss' testimony that he had become addicted to pain medication after his first back surgery and did not want to "go back down that road."  (*Id.* at 58.)  While the ALJ cites a July 26, 2019 treatment note that Buss reported his back was "doing much better following surgery" (*id.* at 19), the ALJ fails to discuss the fact that Buss continued to have intermittent pain that he rated as a 3/10 and that was aggravated by bending, lifting, and extended walking, and that while he had tried mowing the other day, his muscles were bothering him.  (*Id.* at 397.)  In his discussion of the FCE conducted in October 2020, the ALJ fails to mention that Buss walked for seven minutes with an antalgic gait, stood for three minutes shifting his weight and leaning on the countertop, and sat for 30 minutes while shifting his body weight.  (*Id.* at 21, 557-58.)

As set forth above, "[i]n rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  When relevant evidence is not mentioned, the Court cannot tell whether the ALJ discounted the evidence or

overlooked it.  *Shrader*, 2012 WL 5383120, at *6.  A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer*, 774 F. Supp. 2d at 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)).  Remand is required.

As the undersigned recommends remand on this issue, in the interest of judicial economy, the undersigned will not address Buss' additional assignments of error.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and REMANDED for further proceedings consistent with this opinion.

Date: May 1, 2023

        *s/ Jonathan Greenberg*
        Jonathan D. Greenberg
        United States Magistrate Judge

### **OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**